UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TELERENT LEASING CORP.,

       Plaintiff,                            Case Number 11-15476
                                                   Honorable Thomas L. Ludington

v.

PROGRESSIVE MEDICAL
IMAGING PLC et al.,

       Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF, AND GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON CROSS-CLAIM**

What does "in the aggregate" mean?  That is the question in this contract dispute.  The case began when a radiology lab leased a medical device.  The terms of the lease were memorialized in a master lease schedule.  Seven individuals then executed personal guarantees promising that, if the lab defaulted, they would be liable for 20 percent "of the amount funded by the Lessor in the aggregate in connection with the Master Lease Schedules."  The lab made its monthly payments, for a while.  After the payments stopped, this litigation ensued.

The lessor (more precisely, the lessor's successor in interest) brought suit against the lab and the guarantors.  At issue is the extent of the guarantors' liability.  This, in turn, raises the question of what "the amount funded . . . in the aggregate" means.

Both the plaintiff and the guarantors move for summary judgment on the question.  The plaintiff contends that the phrase "the amount funded . . . in the aggregate" means the initial amount funded, the sum total advanced under the lease.  The guarantors contend that the phrase means the current balance due under the lease, the net amount funded.

For reasons detailed below, the plaintiff's interpretation is sound; the guarantors' interpretation, flawed. Briefly, "aggregate" means "the whole sum or amount; sum total." *Webster's Third International Dictionary* 41 (unabridged ed. 2002). It refers to a unitary amount, one "[f]ormed by combining into a single whole or total." *Black's Law Dictionary* 72 (8th ed. 2004). The "amount funded . . . in the aggregate" is "whole sum" funded, the "single whole." Therefore, the guarantee of 20 percent of the amount funded "in the aggregate" does not refer to the net amount funded — but the whole sum.

## I

Plaintiff Telerent Leasing Corp., as noted, is the successor in interest to the original lessor, Phillips Medical Capital, LLC ("Phillips").

Defendant Progressive Medical Imaging & Minimally Invasive Therapeutics, PLC ("Company") is, or was, a radiology lab and diagnostic center located in Saginaw, Michigan.

Defendants Gerard Farrar, Charles Guidot, George Carty, Harold Blumenstein, Richard Jankowski, Stephane Delaunay, Bassam Daghman ("Guarantors") are the seven persons who executed a guarantee on behalf of the Company.

## A

In February 2005, the Company agreed to lease medical equipment from Phillips, memorializing the agreement in a master lease schedule and master lease agreement. *See* Pl.'s Mot. Summ. J. Exs. A–B (attaching master lease schedule and master lease agreement).

It is not clear whether the Company leased more than one piece of medical equipment from Phillips. What is clear is that the Company leased at least one piece — a "PACS with Proplus Service."[1] *See* Master Lease Schedule No. 6, *attached as* Pl.'s Mot. Ex. A. The lease

---

[1] PACS, short for "picture archiving and communication system," is a type of "medical imaging technology which provides economical storage of, and convenient access to, images from multiple modalities. . . . Most PACSs

terms for this item were memorialized in a document titled "master lease schedule no. 6." *See id.* (That it was schedule "no. 6" suggests that the Company may have leased several pieces of equipment from Phillips.)  That document provides that the lease term is 60 months.  *Id.* ¶ 4.  For the first year, the monthly lease payments are $9,694.63 (plus all applicable taxes).  *Id.* ¶ 5.  For the following four years, the monthly lease payments are $15,692.74 (plus all applicable taxes). *Id.*

The master lease agreement provides the general terms of the lease, including assignment rights, remedies in the event of default, and choice-of-law.  The assignment clause provides that Phillips "may at any time assign all or part of any interest in any Lease or and each item of the System and monies to become due to Lessor hereunder."  Master Lease Agreement ¶ 7, *attached as* Pl.'s Mot. Ex. B.  And it provides that the Company agrees that "any such assignment shall not materially change Lessee's duties or obligations."  *Id.*

The remedies section contains an acceleration of indebtedness clause, which provides that if the Company defaults Phillips may declare the full amount due under the lease "immediately due and payable and similarly accelerate the balances due under any other Lease and agreements between [the Company] and [Phillips]."  *Id.* ¶ 14.

And the master lease agreement contains a provision specifying that the lease "is a 'Finance Lease' as that term is defined in Article 2A of the UCC."  *Id.* ¶ 19.

Finally, the master lease agreement contains a choice-of-law provision, providing: "This Agreement and each Lease hereunder shall be binding and effective when accepted by [Phillips] at its corporate office in Wayne, Pennsylvania, shall be deemed to have been made in Wayne, Pennsylvania and except for local filing requirements and laws relating to the conflict of laws,

---

handle images from various medical imaging instruments, including ultrasound (US), magnetic resonance (MR), positron emission tomography (PET), [etc.]."  *Picture archiving and communication* system, Wikipedia, http://en.wikipedia.org/wiki/Picture_archiving_and_communication_system (last visited January 22, 2013).

shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." *Id.* ¶ 20.

The Company took possession of the equipment in September 2005. *See* Pl.'s Mot. Ex. C (attaching delivery and acceptance certificate).

**B**

In May of 2007, the Guarantors executed joint and several liability guarantees in favor of Phillips. *See* Pl.'s Mot. Exs. G–I (attaching guarantees and addenda to guarantees). The guarantees provide that each Guarantor "waives any right to require [Phillips] to (a) proceed with or exhaust remedies against [the Company]." Guarantee ¶ 4, *attached as* Pl.'s Mot. Exs. G–I. In its most important clause, the guarantee establishes the limits of the Guarantors' liability, providing:

> The Guarantors['] joint and several liability hereunder shall not exceed
>
> (i)     twenty percent (20%) of the amount funded by [Phillips] in the aggregate in connection with the Master Lease Schedules; plus
>
> (ii)    all expenses of obtaining or endeavoring to obtain payment or performance under the lease or any security therefore, or of enforcing this Guarantee against such Guarantor, including attorneys' fees and other legal expenses.

Addendum to Guarantee ¶ 2 (formatting supplied), *attached as* Pl.'s Mot. Exs. G–I. And, like the master lease agreement, the guarantees contain a choice-of-law provision selecting Pennsylvania law. Guarantee ¶ 8.

**C**

At some point (the parties do not specify when), Phillips assigned its rights under the master lease agreement to IBM Credit LLC. Evans Decl. ¶ 2, *attached as* Pl.'s Mot. Ex. F. "Of the amount funded by [Phillips] in the aggregate in connection with the Master Lease

Schedules," the undisputed evidence shows, "[Phillips] assigned to IBM Credit LLC rights to the payment of $1,686,945.00 from [the Company]." *Id*. ¶ 11.

IBM Credit, in turn, assigned its rights under the master lease agreement to Plaintiff in August 2008 — in part. *Id*. ¶ 2. Specifically, the undisputed evidence is that "IBM Credit LLC assigned $705,369.97 of the amount funded by [Phillips] in the aggregate in connection with the Master Lease Schedules . . . to [Plaintiff]." *Id*. ¶ 11 (brackets omitted).

**D**

At some point (again, the parties do not specify when), the Company defaulted on its obligations under the master lease agreement and schedule. *See* Evans Decl. ¶ 3. (No explanation of why the Company stopped making the lease payments is provided in the parties' motion papers.)

Instead of accelerating the debt and bringing suit, however, Plaintiff tried to work out a repayment plan with the Company to enable it to service the debt. In April 2011, the parties reached an agreement reducing the Company's monthly obligations by nearly 50 percent.

On April 7, 2011, the parties memorialized their agreement in an "addendum to the master lease schedule." *See* Pl.'s Mot. Ex. D (attaching addendum).

The addendum begins by noting that Phillips "has assigned the payments and certain rights and interests under the [master lease agreement and master lease schedule], including the collecting and servicing of the Lease, to IBM Credit LLC ("IBM Credit"), and IBM Credit has subsequently assigned such payments and rights and interests to [Plaintiff]." *Id*. at 1. The addendum goes on to note that the Company is "in default under the Agreements." *Id*.

Finally, in its operative clause the addendum reduces the Company's monthly payment obligations to Plaintiff. Instead of monthly payments of $15,692.74 (plus taxes), the parties

agreed that the Company would make "16 consecutive monthly payments of $8,000 plus all applicable taxes, followed by 1 payment of $1,882.72 plus all applicable taxes." *Id*.

## E

Still, the Company did not service its debt. Again, it defaulted on its obligations. (Again, no explanation of why the Company defaulted is provided in the parties' motion papers.)

On November 21, 2011, Plaintiff notified the Company that it was accelerating the indebtedness. *See id*. Ex. E. Specifically, Plaintiff notified the Company that "the amount of $113,082.72, plus any interest and cost for which you are obligated by contract (including by Guarantee), is now due and owing." *Id*. at 1. The Company did not pay. This litigation ensued.

## F

On December 14, 2011, Plaintiff filed a two-count complaint in this Court. ECF No. 1. Count one alleges breach of contract against the Company. Count two alleges a breach of the guarantee against the Guarantors. The Company answered the complaint, denying liability. ECF No. 18. The Guarantors also answered, and filed a cross-claim against the Company as well. ECF Nos. 24–25. The Company responded to the cross-claim, denying liability to the Guarantors.

In September 2012, Plaintiff moved for summary judgment against both the Company and the Guarantors. ECF No. 32. The Guarantors, in turn, moved for summary judgment against Plaintiff and the Company. ECF Nos. 34–35.

About this time, the attorney for the Company withdrew.[2] No substitute counsel entered an appearance.

---

[2] In moving to withdraw, the attorney (Jeffrey Schell) represented that the Company was not paying his attorney fees. Responding to the motion to withdraw, the Guarantors provided some background information about the Company. They observed that Saginaw Valley Neurosurgery, PLLC, is the sole member of the Company. They

The Guarantors responded to Plaintiff's motion. ECF No. 38. The Company, unrepresented, did not. Plaintiff likewise responded to the Guarantors' motion. ECF No. 43. Again, the Company did not.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III

### A

Plaintiff first moves for summary judgment against the Company for breach of contract. Plaintiff writes that the Company "executed a written agreement," "accepted delivery of the Equipment," and "has defaulted on the Agreement by failing or refusing to make the lease payments, including the accelerated balance." Pl.'s Br. Supp. Mot. Summ. J. 13. "As of August 29, 2012," Plaintiff further asserts "the total amount due and owing is $138,202.63 ($113,882.72

---

further observed that one of the members of Saginaw Valley Neurosurgery, is Dr. Gerald Schell, MD. Dr. Schell, a prominent neurosurgeon in Saginaw, Michigan is attorney Schell's father.

(principal) + $24,319.91 (interest)).  Interest continues to accrue at a rate of $56.95 per day." *Id.* at 14.

<div align="center">

**1**

</div>

The Company, as noted, has not responded to Plaintiff's motion.  Consequently, Plaintiff is entitled to judgment against the Company as a matter of law.  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 & n.7 (6th Cir. 1992).  Cautioning against "advocacy for the silent," *id.* at 406 n.7, the Sixth Circuit instructs that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion."  *Id.* at 406.

<div align="center">

**2**

</div>

Moreover, an independent review demonstrates that Plaintiff is entitled to the relief sought.  The undisputed facts demonstrate that the parties agreement contains a choice-of-law provision selecting Pennsylvania law and providing that the lease is a "finance lease" under Article 2A of the Uniform Commercial Code.

A federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits.  *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941).  Here, that state is Michigan.

Under Michigan common law, "parties may, in general, agree that all causes of action pertaining to a particular matter will . . . be subject to the law of a particular jurisdiction." *Offerdahl v. Silverstein*, 569 N.W.2d834, 835 (Mich. Ct. App. 1997) (citing *Hardy v. Monsanto Enviro-Chem Sys., Inc.*,  323 N.W.2d 270 (Mich. 1982)).

Specifically, Michigan follows the approach of the *Restatement (Second) of Conflict of Laws*, which generally "permits the application of the parties' choice of law if the issue is one the

parties could have resolved by an express contractual provision" — subject to "two exceptions." *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703–04 (Mich. 1995) (citing *Restatement (Second) of Conflict of Laws* § 187 (1971)).

The first exception "provides that the choice of law will not be followed if the chosen state has no substantial relationship to the parties or the transaction, or when there is no reasonable basis for choosing that state's law." *Id*. (citing *Restatement* § 187(2)(a)).

The second provides that the choice of law will not be followed if it "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id*.

Likewise, Michigan has codified Article 2A of the Uniform Commercial Code, with the Michigan Compiled Laws providing in pertinent part that "a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties." § 440.1105(1).

Here, the transaction bears a reasonable — indeed, a substantial relation to Pennsylvania. That is where the contract was executed and where one of the parties was headquartered. And the terms of the lease are not contrary to Michigan public policy. Thus, under both Michigan common law and § 440.1105(1), Pennsylvania law applies.

In Pennsylvania, as elsewhere, "a cause of action for breach of contract requires that the plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002) (citing *Corestates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999));

*see generally* E. Allan Farnsworth, *Contracts* §§ 1.4–1.7 (4th ed. 2004) (discussing historical development of contract enforcement from Roman law to present).

And Pennsylvania, like Michigan, has codified Article 2A of the UCC.  Under Article 2A, acceptance of goods gives rise to a duty to pay for them: "A lessee must pay rent for any goods accepted in accordance with the lease contract."  13 Pa. Cons. Stat. § 2A516(a)–(b). When a lessee "fails to make a payment," Article 2A further provides, "the lessee is in default under the lease contract and the lessor may . . . [e]xercise any . . . rights or pursue any . . . remedies provided in the lease contract." § 2A523(a) & (a)(6).

Here, a contract exists — the master lease agreement and master lease schedule.  The Company breached one of duties under the contract — it didn't make the monthly lease payments to Plaintiff.  And Plaintiff was damaged — Plaintiff was out the payments it was entitled to.  This much is undisputed.  Thus, whether Pennsylvania common law or Article 2A is applied, Plaintiff is entitled to judgment as a matter of law against the Company.

**B**

Next, Plaintiff moves for summary judgment against the Guarantors for breach of their guarantees.  The Guarantors, in turn, move for summary judgment against Plaintiff on the same issue.

The guarantees have a choice-of-law provision selecting Pennsylvania law.  Guarantee ¶ 8. For reasons discussed above, this provision is enforceable.  Pennsylvania law applies.

Under Pennsylvania law, as elsewhere, a guarantee is a species of contract.  *E.g.*, *Fabral, Inc. v. B & B Roofing Co., Inc.*, 773 F. Supp. 2d 539, 552 (E.D. Pa. 2011); *see generally* Farnsworth, supra, § 6.3 (discussing "contracts to answer for the duty of another").

Here, the existence of a contract (the guarantee) is not disputed.  What is disputed is what its terms mean — specifically, what it means that the Guarantors' liability "shall not exceed . . . twenty percent (20%) of the amount funded by the Lessor in the aggregate in connection with the Master Lease Schedules."  Addendum to Guarantee ¶ 2.  More particularly, the dispute centers on what "the amount funded . . . in the aggregate" means.

Plaintiff asserts that this phrase refers to the initial amount loaned by Phillips to the Company, which Plaintiff writes "is in the approximate amount of $4,000,000.00." [3]  Pl.'s Br. 16.  Thus, Plaintiff assert, the Guarantors are liable for up to $800,000 (plus collection costs).  *Id.*

The Guarantors contend that the "amount funded . . . in the aggregate" refers not to the initial amount loaned — but the current amount due on the principal.  "The Master Lease Schedules provide for monthly payments by the lessee," the Guarantors reason, "each thereby reducing the aggregate amount funded by the Lessor and making that aggregate amount an always changing amount."  Guarantors' Br. Supp. Mot. Summ. J. 4.  Because the current amount due on the principal is $113,082.72, the Guarantors assert that their liability is limited to $22,616.54 (plus costs of collection).  *Id.*

Plaintiff is correct about what "in the aggregate" means in this context.  But Plaintiff is wrong about the amount that the Guarantors are liable for.

### 1

"Aggregate," as noted, is defined by *Webster's* as "the whole sum or amount; sum total." *Webster's Third International Dictionary* 41 (unabridged ed. 2002).  *Black's* likewise defines aggregate as a unitary amount, one "[f]ormed by combining into a single whole or total." *Black's Law Dictionary* 72 (8th ed. 2004).

---

[3] But, Plaintiff acknowledges, "That exact amount cannot be confirmed."  Pl.'s Br. 16.

As applied, then, the "amount funded . . . in the aggregate" means the "whole sum" funded, the "single whole."  This cannot reasonably be interpreted to mean "an always changing amount" — as the Guarantors would have it.  *See* Guarantors' Br. 4 (quoted above).  That is, the "aggregate" amount funded is not the net amount funded.  It is the total.

Reinforcing this conclusion is the venerable surplusage canon of interpretation, which instructs that a document "is to be so construed that every part and every word shall have its effect."  *City of Erie v. Bootz*, 72 Pa. 196, 199 (1872); *see also Burdon Cent. Sugar Ref. Co. v. Payne*, 167 U.S. 127, 142, 17 S. Ct. 754, 756, 42 L. Ed. 105 (1897) ("[T]he contract must be so construed as to give meaning to all its provisions, and that that interpretation would be incorrect which would obliterate one portion of the contract in order to enforce another part thereof.").

Or, as the canon was explained more recently, "If possible, every word and every provision is to be given effect (*verba cum effectua sunt acceipienda*).  None should be ignored.  None should be given an interpretation that causes it to duplicate another provision or to have no consequence." Antonin Scalia & Brian A. Garner, *Reading Law* 174 (2012).

Here, the Guarantors' interpretation would render "aggregate" mere surplusage.  If the guarantee promises no more than liability for 20 percent of the net amount funded (plus costs of collection), the phrase "in the aggregate" is of no consequence — it does no semantic work.  The same meaning is conveyed simply with "the amount funded."

The same meaning would be conveyed by the Guarantors promising to guarantee "twenty percent (20%) of the amount funded by the Lessor."  Addendum to Guarantee ¶ 2. But that isn't what the guarantee provides.  It provides that the Guarantors guarantee "twenty percent (20%) of the amount funded by the Lessor *in the aggregate*."  *Id*. (emphasis supplied).  For this phrase to

be given effect, it must mean something more than 20 percent of "the amount funded." And it does, of course. It means 20 percent of the "whole sum" funded. *See Webster's*, *supra*, at 41.

Plaintiff's interpretation of "aggregate" is sound. It means the whole amount funded, not the net.

<div align="center">2</div>

Plaintiff is not correct, however, about amount that the Guarantors are liable for. Rather, Plaintiff's recovery is limited by the law of assignment, under which "the assignee succeeds to no greater rights than those possessed by the assignor." *Employers Ins. of Wausau v. Com., Dept. of Transp.*, 865 A.2d 825, 830 (Pa. 2005) (citing *Himes v. Cameron Cnty. Constr. Corp.*, 444 A.2d 98, 100 (Pa. 1982)). More precisely, the assignee succeeds to those rights possessed by the assignor "at the time of [the] assignment and no greater." *Swoope v. Wakefield*, 10 Pa. Super. 342, 351 (1899).

Here, the undisputed evidence is that "IBM Credit LLC assigned $705,369.97 of the amount funded by [Phillips] in the aggregate in connection with the Master Lease Schedules . . . to [Plaintiff]." Evans Decl. ¶ 11 (brackets omitted). That is the right possessed by the assignor granted to Plaintiff. That is the amount funded by Phillips "in the aggregate" that Plaintiff can claim an interest in. And that, so far as Plaintiff is concerned, is the amount that the Guarantors' have guaranteed. Consequently, the Guarantors are liable to Plaintiff for no more than 20 percent of that amount, or $141,073.99 (plus collection costs).

<div align="center">3</div>

Against this conclusion, the Guarantors argue that Plaintiff "lacks standing to assert a claim against Defendants." Guarantor's Br. 4. The Guarantors elaborate: "[Plaintiff] has not

provided any evidence demonstrating that it is the lawful assignee to the non-breaching party." *Id*. at 5.

This argument, however, overlooks the addendum to the master lease schedule. As noted, on April 7, 2011, Plaintiff and the Company executed a document titled "addendum to the master lease schedule." *See* Pl.'s Mot. Ex. D (attaching addendum). The addendum begins by noting that Phillips "has assigned the payments and certain rights and interests under the [master lease agreement and master lease schedule], including the collecting and servicing of the Lease, to IBM Credit LLC ("IBM Credit"), and IBM Credit has subsequently assigned such payments and rights and interests to [Plaintiff]." *Id*. at 1.

Additionally, Plaintiff submits a sworn declaration of one of its vice presidents, Charles Evans, declaring that Phillips assigned rights under the lease to IBM Credit, which assigned those rights to Plaintiff. Evans Decl. ¶ 11.

The Guarantors submit no evidence to dispute this. Under Pennsylvania law, "the assignee stands in the shoes of the assignor." *Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak*, 539 A.2d 357, 358 (Pa. 1988). Plaintiff has standing to enforce the terms of the guarantee. Specifically, Plaintiff has the rights possessed by the assignor granted to Plaintiff — that is, the right to collect 20 percent of $705,369.97, or $141,073.99 (plus collection costs).

## C

Finally, the Guarantors move for summary judgment against the Company. Asserting that if they are liable to Plaintiff, the Company is liable to them, the Guarantors explain: "The right of subrogation arises when the surety becomes obligated to satisfy the debts of its principal." Guarantors' Br. Supp. Mot. for Summ. J. against Co. 5 (quoting *In re V. Pangori & Sons, Inc.*, 53 B.R. 711, 715 (Bankr. E.D. Mich. 1985)).

**1**

The Company, as noted, has not responded to the Guarantors' motion.  Thus, the Guarantors are entitled to judgment against the Company as a matter of law.  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 406 & n.7 (6th Cir. 1992) (cautioning against "advocacy for the silent").

**2**

Even if the Company had responded, moreover, an independent review demonstrates that the Guarantors would nevertheless be entitled to judgment as a matter of law.

"The familiar rule," the Supreme Court instructs, "is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes." *Putnam v. Comm'r*, 352 U.S. 82, 85 (1956) (collecting cases); *see also In re Lewis*, 398 F.3d 735, 747 (6th Cir. 2005) ("[E]quitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other." (quoting *Commercial Union Ins. Co. v. Med. Protective Co.*, 426 109, 393 N.W.2d 479, 482 (Mich. 1986))).

Here, on the Guarantor's payment of the Company's debt, the Company's obligation to Plaintiff will become an obligation to the Guarantors.  That is, the Guarantors will be equitably subrogated to the rights of Plaintiff.   Thus, the Guarantors are entitled to judgment against the Company as a matter of law.

**IV**

Accordingly, it is **ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 32) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the Guarantors' Summary Judgment Motion against Plaintiff (ECF No. 34) is **DENIED**.

It is further **ORDERED** that the Guarantors' Summary Judgment Motion against the Company (ECF No. 35) is **GRANTED**.

It is further **ORDERED** that Plaintiff must submit a supplemental brief enumerating the present amount due under the lease (including principal and interest) and costs of collection (including adequate information and supporting documentation to calculate the attorney's fees) by February 5, 2013.

It is further **ORDERED** that Guarantors may file a response brief addressing the present amount due under the lease (including principal and interest) and costs of collection by February 19, 2013.

 

                                            s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

Dated: January 22, 2013

<div style="border:1px solid black; padding:10px;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 22, 2013.

                        s/Tracy A. Jacobs
                        TRACY A. JACOBS

</div>